## Hoffman v. Hoffman

*Arthur W. A. Cowan*, for libellant.
*William A. Gray*, for respondent.

SLOANE, J., July 2, 1945.—This matter comes before me on libellant's petition for alimony pendente lite,

counsel fees, and costs. An answer was filed and depositions taken.

Respondent raised the question of jurisdiction when it appeared on the hearing of the depositions that libellant was a resident of Atlantic City, N. J., at the time she filed her libel on July 31, 1944. She testified she had gone there from Philadelphia on June 1, 1944, for the purpose of earning some money by operating a rooming house there. It is 'not altogether clear from her testimony whether this was a temporary residence in New Jersey for economic reasons, and not terminating a previous domicile here if she had one, or whether it amounted to a removal from this jurisdiction. If merely a temporary absence for business or employment reasons her domicile could remain here and this court retain jurisdiction. See Huston v. Huston, 130 Pa. Superior Ct. 501, 509 (1938).

Aside from making the factual claim that libellant's domicile is here, counsel for libellant also contends that this is not the proper time to consider the question of residence at all, that it can be taken up only at a later stage in the proceedings when the merits of the case are heard, and that it has no place in hearing a petition for alimony pendente lite. There are few decisions in our State on this point. The correct rule appears to be this: if the facts as averred and testified to by libellant show residence and jurisdiction while respondent's proof is to the contrary, an order for alimony pendente lite (if otherwise justified) should be made and the issue of jurisdiction litigated at a later stage before the master or the court. See Nave v. Nave, 58 Montg. 112 (1941). For to hold otherwise might deprive a libellant of the opportunity to show that her contention as to residence is correct. On the other hand, if it clearly appears from her averments or her testimony on the depositions that she has no permanent residence here, that no decree could be entered in her favor no matter what the

evidence as to the cause for divorce might show, then of course no order for alimony pendente lite should be made; indeed the libel should properly be dismissed at this stage. The decision in Ames v. Ames, 7 Pa. Superior Ct. 456 (1898), cited by libellant's counsel, with its implication that a nonresident wife may have a "constructive residence" in this State in the county of her husband's domicile for the purpose of bringing a divorce action, is not helpful here, though the actual Ames decision involved alimony pendente lite only. Cf. Hilyard v. Hilyard, 87 Pa. Superior Ct. 1 (1926).

In the present case the testimony as to libellant's residence is not wholly satisfactory. For example, her libel states her residence to be 6250 Spruce Street while her testimony was that she lived at 4103 Chester Avenue in Philadelphia prior to going to Atlantic City. But it does not clearly appear that there was no local residence and no jurisdiction; it is therefore better to have this issue more fully explored at a later stage.

Because of the peculiar circumstances of this case the usual guiding principles in the consideration of whether alimony pendente lite should be allowed, and in what amount, are difficult of application. The factors ordinarily to be considered are the necessity of the wife, her separate estate, the husband's property and income as establishing his ability to pay, the style in which the parties lived when they were together, and generally, the character, situation, and surroundings of the parties. See Homler v. Homler, 120 Pa. Superior Ct. 66, 68 (1935).

"One of the purposes in fixing alimony *pendente lite* is to award the wife money with which to meet her *expenses* in connection with the litigation, until a final decree is entered, and her permanent alimony is fixed under the decree for divorce from bed and board": Rutherford v. Rutherford, 152 Pa. Superior Ct. 517, 528 (1943).

The testimony upon the depositions failed to disclose the financial status of respondent with any degree of

certainty. This was due to his evasiveness, his convenient "loss of memory", and his extremely marked disinclination to disclose anything about his affairs. He was in his answers the direct opposite of being forthright.

Libellant testified that her husband had a very large income when they lived together. Their entire married life together was spent in Atlantic City, N. J. (according to the libel), and the final separation occurred there February 15, 1942. She said that his income in that period was between $50,000 and $100,000 a year, and that it was derived mainly from illegal enterprises, that he was a betting commissioner, had horserooms, houses of prostitution, gambling places, that he had boardwalk concessions, music boxes, bingo parlors, pinball machines, etc. Evidence that respondent had a long criminal record dating back for many years, and that he has recently been convicted of setting up an illegal lottery and is at liberty under $10,000 bail pending disposition of a motion for a new trial, was introduced at the hearing of the depositions. Respondent's counsel objected to this testimony since the court (Crumlish, J.), had ordered stricken from libellant's petition those paragraphs which recited the alleged criminal record and activities of respondent and had no reference to income. However, the court did not bar such evidence where it tended to show respondent's income, though of course respondent cannot be compelled to incriminate himself.

Libellant further testified that they had lived on a lavish scale, that respondent entertained a great deal, spent money freely in night clubs, and gambled for large stakes. She said that he had given her many expensive gifts including three automobiles, six fur coats, expensive jewelry and considerable clothes, and very many pairs of shoes. All this dated back to the time they lived together in Atlantic City, prior to February 1942. Libellant admittedly knew the sources of

respondent's income, and apparently had no objection to sharing it. In fact, she testified that she drove respondent about on his rounds to make collections from places where his pinball machines were installed.

It appears that respondent was forced to leave Atlantic City some time prior to the separation of the parties, and is no longer allowed to "operate" there, so that libellant's testimony as to respondent's income and their scale of living has no application to the past three years. As to this period the testimony is meager.

Respondent was called as for cross-examination and testified that he has not worked for the past year because his health is not good; that previously he worked in his brother-in-law's butcher shop for $20 a week. He also admitted that occasionally he placed bets for others with bookmakers, and that when the bettor lost the "bookie" would give him a commission. He said that his income from this source was uncertain and not large, that he might make nothing for three months and then in a few months make several hundred dollars. He also admitted that recently he had made $300 in this strange way—by "reminding" a man he happened to meet that another was looking for him. He further admitted that he had a half-interest in a credit clothing business in Wilmington, Del., but claimed that this business has been losing money and that he derives no income from it. He failed to produce books of this business though subpœnaed to do so, claiming, without explanation, that the business would not be able to operate if the books were taken from Wilmington to Philadelphia. Respondent did admit that several years ago he used to make from $75 to $100 a week operating bingo games in Atlantic City, but that he can no longer make this much money.

Respondent testified that he paid $140 or $160 income tax last year (apparently 1944), and that he had filed as a "betting commissioner".

Respondent's brother-in-law testified that he had employed respondent in his butcher shop until about a year ago at $20 a week; that since that time respondent has not worked for him and stays at home. He said he gave respondent sums of money from time to time, $5 or $10 whenever he had the money.

The testimony on the depositions both of respondent and his brother-in-law leaves an unmistakable impression of lack of frankness, and of complete unreliability. The net result, because of this evasiveness, is that we know very little of respondent's real business and of his actual current income. There are indications that he still engages in activities which bring in considerable income; for example, when he was ill recently, he spent three weeks in the Pennsylvania Hospital, securing the most expensive accommodations. The telephone record kept by the hospital shows a very large number of phone calls were made from his room, averaging about 15 or 20 a day, and that these included calls to out-of-town places such as New York, Atlantic City, Wilmington, Chester, and Miami, Fla. It is hard to believe all were social calls, or calls to doctors, not related to any business or source of income. And in view of his indirection and generally unsatisfactory testimony, he can have only himself to blame for any overestimate of his income. See Gould v. Gould, 95 Pa. Superior Ct. 387, 389 (1928).

Libellant's testimony was adequate to establish necessity for an order for her maintenance during the pendency of the proceedings, and for an award for counsel fees and costs. She testified that after respondent left her she worked as a riveter in 1942, had a job driving a taxicab early in 1943, but that she lost both these positions, and that last summer she operated a rooming house in Atlantic City, N. J., from which she made $500.

Upon consideration of the entire matter I hereby enter the following

*Order*

Respondent shall pay alimony pendente lite to libellant in the amount of $200 per month, commencing January 1, 1945, and shall pay the further sum of $300 for counsel fees and costs.